UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| UNITES STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | No. 2:13-cr-176-GZS |
| | ) | |
| CRAIG MERCER, | ) | |
| | ) | |
| Defendant | ) | |

*RECOMMENDED DECISION ON MOTION TO SUPPRESS*

Craig Mercer, indicted on one count of possession with intent to distribute a mixture or substance containing cocaine in violation of 21 U.S.C. § 841(a)(1), *see* Count Nine, Superseding Indictment (ECF No. 31), moves to suppress all evidence obtained as a result of, and subsequent to, an assertedly illegal traffic stop on September 20, 2013, *see* Defendant Craig Mercer's Motion To Suppress All Evidence Obtained From Pretextual Traffic Stop on September 20, 2013 and All Evidence Obtained Downstream From Same Pursuant to the So-Called "Fruit of the Poisonous Tree" Doctrine ("Motion") (ECF No. 103).

An evidentiary hearing was held before me on March 26, 2014, during which the defendant appeared with counsel. Shortly after the government's counsel began direct examination of the government's first witness, the parties made a joint oral motion for a continuance to permit the government to supply additional evidence to the defendant and to allow an opportunity for the parties to brief the question of their differing interpretations of 29-A M.R.S.A. § 2071, a Maine motor vehicle law pertaining to turning and signals. The hearing resumed on April 14, 2014, at which time the defendant again appeared with counsel. The government presented two witnesses and offered 10 exhibits, which were admitted without objection. The defendant offered two

exhibits, which were admitted without objection. After both sides rested, counsel for each argued orally.

I now recommend that the following findings of fact be adopted and that the Motion be denied.

## I. Proposed Findings of Fact

On September 19, 2013, Paul Buchanan, a United States Drug Enforcement Agency ("DEA") special agent based in Portland, Maine, intercepted a call between David Jones and Richard Magee through a court-authorized wiretap of Jones' phone obtained as part of an investigation into suspected drug trafficking activity. Jones asked Magee if he had "any of that really killer shit you gave me . . . in the bathroom that day[.]" Gov't Exh. 2. Magee stated that he did, but not with him. *See id*. Jones asked if Magee would "save me some of it for tomorrow[,]" and Magee responded, "You got it buddy." *Id*. Based on his knowledge of drug trafficking generally, in which code language typically is used to refer to drugs, as well as his knowledge of the relationship between Jones and Magee, Buchanan construed the phrase "really killer shit" to mean cocaine.

As of September 19, 2013, pursuant to the wiretap, Buchanan and other DEA agents had been monitoring Jones' calls for between 30 and 60 days. Buchanan had learned that Jones and Magee spoke one to three times weekly on the phone and had concluded, based on those calls and surveillance, that Jones was purchasing small quantities of cocaine from Magee, presumably for personal use, and that one of the locales used for those sales was Ruski's, a bar/restaurant on Danforth Street in Portland's West End.

As of September 19, 2013, from review of law enforcement reports and conversations with other DEA agents, Buchanan also knew of two prior cocaine sales incidents involving Magee.

Buchanan had learned that, (i) in September 2011, a confidential informant working under the direction of a local law enforcement agency had purchased one ounce of cocaine from Magee in South Portland, and had described Magee as a kilogram quantity cocaine dealer, and (ii) in October 2011, DEA agents had observed Magee engaged in what appeared to be a drug transaction with two individuals in the parking lot of a Mexican restaurant in South Portland, had afterward approached those individuals, who admitted that they had just purchased cocaine from Magee and described the denominations of money used to pay for it, and then had approached Magee, who denied that he had sold cocaine but produced money from his person consistent with the denominations that the individuals had described.

At approximately 9:30 a.m. on September 20, 2013, Buchanan intercepted another call in which Jones told Magee that he was eating some breakfast, and Magee responded, "I'll be there in about 30 minutes if you're gonna still be there." Gov't Exh. 3. Jones said he should still be there, and Magee responded, "Alright. I'll be about thirty." *Id*. Buchanan knew at the time of the call that Jones was at Ruski's, although he did not know where Magee was. At about 10:30 a.m., Buchanan intercepted another call in which Jones asked Magee where he was. *See* Gov't Exh. 4. The following conversation ensued:[1]

> RM: I'm still in Gorham trying to get there to you I'm just running so behind. . . .
>
> DJ: Yeah do you want me to go, you want me to come out there?
>
> RM: That might be easier . . . . Is Craigy still out at the Ruski's?
>
> DJ: Ah yeah.
>
> RM: Okay tell him to wait there because I'm coming there, but . . . .
>
> DJ: Alright.

---

[1] "RM" is Magee, and "DJ" is Jones. *See* Gov't Exhs. 3-5.

  RM: I'd rather drive out in there, you know. Unless you . . . you're in a hurry come to me, if not, wait there I'll be there shortly. I'm just grabbin' Josh's fuckin' (U/I).

  DJ: Yeah, but I'm kinda in a hurry cause I have to get my hair cut and fucking go up north.

  RM: Alright.

  DJ: So I'll just come out there and see you.

  RM: Alright, tell Craig to wait there.

  DJ: Alright. I will.

*Id.*

Upon intercepting that call, the DEA dispatched three or four agents to Ruski's and others to the vicinity of Magee's residence in Gorham. Buchanan was among the agents sent to Ruski's. On his arrival, he did not see Jones' vehicle. However, agents in Gorham apprised Buchanan that they observed Jones, accompanied by a woman whom they recognized as Jones' girlfriend, arrive at Magee's residence in Jones' Cadillac, park in Magee's driveway, walk up the driveway to the residence, and shortly thereafter depart in the Cadillac. Agents did not observe Jones meet with Magee or see Jones picking anything up from him. However, Buchanan believed that the contemplated drug transaction had in fact occurred. About 10 minutes after Jones left, Magee departed, and agents followed his vehicle directly to Ruski's.

Before Magee arrived at Ruski's, Buchanan observed a man whom he now knows was the defendant pacing up and down the sidewalk in front of Ruski's. At the time, Buchanan did not know who "Craigy" or "Craig" was and had never intercepted any calls involving him. Magee arrived and parked alongside Ruski's, directly behind a gold Saturn with New Hampshire license plates. The defendant was standing on the sidewalk next to the passenger's side of the Saturn. Magee walked up to the driver's side, momentarily leaned inside the driver's side window, which

4

was down, appeared to converse with the defendant, and then stood up and continued conversing with him. Buchanan did not know when the Saturn had arrived or who had driven it.

Magee then walked inside Ruski's, where another DEA agent conducting surveillance observed him hand a package to a female bartender, say something to the effect, "Give this to the boss," and leave without interacting with anyone else or ordering any food or drink. Buchanan then observed Magee and the defendant sit down outside of Ruski's, smoke cigarettes, and appear to socialize for several minutes. The defendant got into the driver's seat of the gold Saturn, while Magee leaned into the car through the open passenger's side window and continued to converse with him. The defendant departed in the gold Saturn. At no point had any agent observed the defendant go inside Ruski's.

Neither Buchanan nor any other agent present at Ruski's that morning was able to see the interior of the Saturn from their vantage points. No agent saw anything placed in any vehicle, saw any drugs, or saw anything handed from Magee to the defendant. Nor could Buchanan hear what they said to one another. Nevertheless, according to Buchanan, agents typically do not see drugs during surveillance of a suspected drug deal. Given the totality of what he knew and had observed, Buchanan believed that Magee had just supplied the defendant with some unknown quantity of drugs.

Before the defendant departed, the DEA requested that the Portland Police Department make a so-called "identity stop" of the gold Saturn – that is, stop the car and identify the driver if Portland police could develop their own rationale for the stop, for example, by observing a traffic infraction. The DEA, which was still involved in an active wiretap and investigation, requested the identity stop to shield its involvement in the matter.

5

Portland police officer Robert Pelletier, who was on duty in his marked cruiser in Portland's West End that day, responded to DEA's request. He observed the Saturn parked at Ruski's and spoke with a DEA agent, who informed him that, if the Saturn was driven from Ruski's, he was to stop it if he found cause to do so lawfully, identify the driver, and send him on his way. Pelletier did not see the Saturn depart but was informed that it had done so. He caught up with it heading north on Commercial Street in Portland and followed it as it continued onto the Fore River Parkway, reached the intersection with Congress Street, and turned left. He observed the defendant change lanes without signaling and then make the left-hand turn onto Congress Street without signaling. He activated his blue lights, and the defendant promptly complied, making his first right onto Douglass Street and pulling over.[2] Pelletier observed the defendant lean to the right side of the vehicle.

Pelletier approached the driver's side of the Saturn and asked the defendant for his registration and license and explained that he had pulled him over for making lane changes and a left-hand turn without signaling. The Saturn was not registered to the defendant. Pelletier returned to his vehicle and ran a search that disclosed that the defendant was subject to two outstanding warrants for his arrest, one for unpaid fines but both relating to convictions for carrying a concealed weapon. Pelletier radioed for additional police backup to arrest the defendant on the outstanding

---

[2] Pelletier's cruiser was equipped with a dashboard camera that was activated as soon as he turned on his blue lights and recorded for a period prior to its activation. The video from the dashboard camera, introduced into evidence as Gov't Exh. 5, clearly depicts one instance in which the defendant changed lanes without signaling prior to making the left-hand turn onto Congress Street. Pelletier testified that he observed the defendant make several lane changes without signaling. While that is possible, given Pelletier's testimony that his view as driver differed from that of the camera, which was mounted on the passenger side of the dashboard, for purposes of resolution of the Motion, I need not resolve the discrepancy. I accept that the defendant made at least one lane change without signaling. The video also clearly depicts the defendant's failure to signal before turning left on Congress Street. At hearing, counsel debated whether a glint of the Saturn's taillights as it turned was a turning signal *versus* brake lights or a reflection from the sun. I am satisfied that the glint was either a reflection or fleeting brake lights. It is distinctive in color and appearance from the signal made when the defendant turned right on Douglass Street. The video also reveals that the defendant was not alone in failing to signal while changing lanes or turning left. However, that is not relevant for these purposes.

warrants. Officers removed the defendant from his car and patted him down, discovering an object that appeared to be cocaine as well as a padlock secreted in a bandana. Officers arrested the defendant on charges related to the presumed cocaine and the concealed padlock, which was viewed as a weapon, as well as on the outstanding warrants. Pelletier then searched the Saturn and found what appeared to be cocaine in a boot on the passenger side floor.

The Fore River Parkway, where it intersects Congress Street, consists of one right-hand turning lane and two left-hand turning lanes. Markings on the road indicate that the lane on the right is for right-hand turns, and the lanes on the left are for left-hand turns. A separate traffic light controls the two left-hand lanes, and a dedicated right-hand turn traffic light controls the right-hand lane. There is no other signage indicating that those lanes are for left- or right-hand turns only. It is impossible to go straight ahead at the intersection: the Fore River Parkway ends at Congress Street, which runs perpendicular to it. An island separates the right-hand turning lane from the two left-hand turning lanes. However, it is possible as one approaches the intersection to switch to the right-hand lane from the left-hand lane. There was considerable traffic on the Fore River Parkway as the defendant made the left-hand turn in the outer left-hand turning lane, with cars in front of him, behind him, to his left, and to his right.

## II. Discussion

The defendant argues that neither the DEA nor the Portland police had reasonable suspicion to make the "pretextual" stop of the Saturn that he was driving on September 20, 2013, and, as a result, all evidence obtained as a result of the stop must be suppressed as "fruit of the poisonous tree." *See generally* Motion.[3] The government counters that law enforcement officers had

---

[3] "Under the 'fruit of the poisonous tree' doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation." *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998).

7

reasonable suspicion to stop the Saturn based on any of three grounds: that the defendant (i) had just been observed participating in what they reasonably suspected was a drug transaction with a known drug dealer, (ii) was observed changing lanes at least once on the Fore River Parkway without signaling, and (iii) was observed making a left-hand turn from the Fore River Parkway onto Congress Street without signaling. *See* Government's Objection to Defendant's Motion To Suppress Evidence ("Objection") (ECF No. 115) at 4-5. The government adds that, once Pelletier's search revealed that there were two outstanding warrants for the defendant's arrest, he was properly subjected to a pat-down search incident to arrest and lawfully arrested on further charges based on the discovery of suspected cocaine and a concealed padlock, and that the Saturn was then properly searched on either of two bases – incident to the defendant's arrest or pursuant to the so-called automobile exception. *See id*. at 5-[6]. With respect to the search of the Saturn, the government also contends that the defendant fails to make the requisite threshold showing that he had an expectation of privacy in that vehicle. *See* Government's Supplemental Memorandum Relating to Defendant's Motion To Suppress Evidence ("Government's Suppl. Memo") (ECF No. 149) at 4-5.

The government bears the burden of proving the lawfulness of warrantless searches and seizures, *see, e.g., United States v. Ramos-Morales*, 981 F.2d 625, 628 (1st Cir. 1992), including traffic stops, *see, e.g., United States v. Gates*, Criminal No. 08-42-P-H, 2008 WL 5382285, at *7 (D. Me. Dec. 19, 2008) (rec. dec., *aff'd* Feb. 12, 2009), *aff'd*, 709 F.3d 58 (1st Cir. 2013), and arrests, *see, e.g., United States v. Jenkins*, Criminal No. 10-85-P-H, 2010 WL 3463736, at *5 (D. Me. Aug. 27, 2010) (rec. dec., *aff'd* Oct. 18, 2010), *aff'd*, 680 F.3d 101 (1st Cir. 2012). The defendant bears the burden of proving, as a threshold matter, that he or she had a reasonable

expectation of privacy with respect to an area searched or the items seized. *See, e.g., United States v. Rodríguez-Lozada*, 558 F.3d 29, 37 (1st Cir. 2009).

For the reasons that follow, I conclude that the government carries its burden of proving the lawfulness of the traffic stop. This is fatal to the Motion, which predicates its bid for exclusion of the subsequently seized evidence on a "fruit of the poisonous tree" argument. In any event, the government carries its burden of proving the lawfulness of the pat-down search of the defendant incident to his arrest, and the defendant fails to carry his burden of demonstrating that he had a reasonable expectation of privacy in the Saturn. Even if he had carried that burden, the government demonstrates the lawfulness of the search of that vehicle.

### A. Traffic Stop

The First Circuit has observed:

> In *Terry v. Ohio,* [392 U.S. 1 (1968)], the Supreme Court first recognized that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest. This authority permits officers to stop and briefly detain a person for investigative purposes, and diligently pursue a means of investigation likely to confirm or dispel their suspicions quickly.

*United States v. Trueber,* 238 F.3d 79, 91-92 (1st Cir. 2001) (citations and internal punctuation omitted).

The validity of an investigative *Terry* stop hinges on "whether the officer's actions were justified at their inception, and if so, whether the actions undertaken by the officers following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officers during the stop." *Id*. at 92 (citations and internal punctuation omitted). An "objective reasonableness standard" governs. *United States v. Moore*, 235 F.3d 700, 703 (1st Cir. 2000).

"The first part of the [*Terry*] inquiry is satisfied if the officers can point to specific and articulable facts which, taken together with rational inferences derived from those facts, reasonably show that an investigatory stop was warranted." *United States v. Maguire*, 359 F.3d 71, 76 (1st Cir. 2004). "To withstand scrutiny [in the context of a *Terry* stop], an officer must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *Id.* (citations and internal quotation marks omitted). "[T]he focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation." *United States v. Capelton*, 350 F.3d 231, 240 (1st Cir. 2003) (citation and internal quotation marks omitted) (observing that knowledge of DEA agents who undertook investigation could be imputed to state police who actually effectuated *Terry* stop under "fellow officer rule").

In both his Motion and through counsel at oral argument, the defendant decried the traffic stop at issue as "pretextual." *See, e.g.*, Motion at 2. The government concedes that the stop was pretextual; however, it correctly notes that this does not undercut the validity of a traffic stop predicated on the requisite reasonable suspicion. *See* Objection at 4; *see also, e.g., United States v. McGregor*, 650 F.3d 813, 820 (1st Cir. 2011) ("An officer can stop a car if he sees a driver commit a traffic offense, even if the stop is just an excuse to investigate something else.")

### 1. Suspected Drug Trafficking

In its brief and at oral argument, the government persuasively contended that, even apart from the defendant's alleged traffic infractions, law enforcement officers had reasonable suspicion to stop the Saturn based on his suspected participation in a drug deal. *See, e.g.*, Objection at 4-5. The DEA knew, from the controlled purchase of cocaine from Magee in September 2011, its questioning of Magee and two drug customers in October 2011, its interception of Jones' calls, and its ongoing surveillance, that Magee was dealing cocaine, Jones was one of his cocaine

customers, and Ruski's was one of his drug trafficking venues. It knew from its interception of Jones' conversation with Magee on September 19, 2013, that Jones planned a purchase of "really killer shit," which Buchanan construed as code language for cocaine, on the morning of September 20, 2013. DEA agents' surveillance and continued interception of Jones' calls that morning tended to corroborate that suspicion. When Magee was running late for his rendezvous with Jones at Ruski's, he suggested that Jones drive out to his home in Gorham. Jones, accompanied by his girlfriend, did so. He parked in Magee's driveway, briefly went in, returned to his car, and drove away. While agents did not witness any exchange of drugs and money, the conduct that they did witness was consistent with a drug trafficking transaction.

Against this backdrop, agents chose to maintain surveillance at Ruski's upon learning that Magee, a known cocaine dealer, intended to drive to Ruski's, one of his known drug trafficking venues, to meet with the then-unknown "Craigy" or "Craig," whom Magee had Jones, his known drug customer, notify to wait. Once more, they did not observe an exchange of drugs for money. However, everything that they did observe was consistent with a drug transaction. The defendant was pacing the sidewalk in front of Ruski's seemingly waiting for someone. Magee parked behind the Saturn and then leaned into it through its open driver's side window as he and the defendant conversed. Magee went into Ruski's, gave a package to a female bartender for the boss, and left. He conversed with the defendant for a few more minutes and leaned into the Saturn through its open passenger's side window after the defendant got into the driver's seat. The defendant then departed in the Saturn. Neither the defendant nor Magee had been observed ordering food or drink from Ruski's. As the defendant emphasized in his briefs and at oral argument, agents never observed any exchange of drugs for money, and it was possible that the interactions that they had observed were innocent ones; for example, a discussion about a lawful purchase or a social event.

11

*See, e.g.*, Supplemental Memorandum in Support of Defendant's Motion To Suppress (Turn Signal) ("Defendant's Suppl. Memo") (ECF No. 147) at 2-3. Nonetheless, agents need not have been certain that this was, in fact, a drug deal. They need only have developed the requisite reasonable suspicion, and on the totality of these circumstances, they had.

On this basis alone, Pelletier's stop of the Saturn was lawful, even though Pelletier himself had not developed reasonable suspicion that the defendant was engaged in a drug transaction and cited only the defendant's traffic violations in pulling him over. *See, e.g.*, *United States v. Barnes*, 506 F.3d 58, 63 (1st Cir. 2007) ("[R]easonable suspicion can be imputed to the officer conducting a search if he acts in accordance with the direction of another officer who has reasonable suspicion."); *see also, e.g., United States v. Carter*, No. CR-12-278-D, 2013 WL 372461, at *4 n.1 (W.D. Okla. Jan. 30, 2013) ("Under the vertical collective knowledge doctrine, an arrest or stop is justified when an officer having probable cause or reasonable suspicion instructs another officer to act, even without communicating all of the information necessary to justify the action.") (citation and internal quotation marks omitted); *United States v. Mendonca*, 682 F. Supp.2d 98, 105 (D. Mass. 2010) ("[T]he fact that officers acted on one rationale would not foreclose the government from justifying the search by proving [another].") (citation and internal quotation marks omitted).

### 2. Lane Change Without Signaling

As is the case with *Terry s*tops generally, a traffic stop based on a traffic infraction "must have been supported by a reasonable suspicion that a traffic violation occurred." *Kenney v. Floyd*, 700 F.3d 604, 608 (1st Cir. 2012).

Pelletier personally observed the defendant make more than a lane change on the Fore River Parkway without signaling. He, therefore, lawfully stopped the Saturn based on that infraction.[4]

### 3. Left Turn Without Signaling

Pelletier testified, and his dashboard camera video corroborates, that the defendant made a left-hand turn without signaling. However, the parties dispute whether that was a traffic infraction pursuant to 29-A M.R.S.A. § 2071. Section 2071 provides, in relevant part: "An operator may not turn a vehicle without giving an appropriate signal *if other traffic may be affected by that movement*." 29-A M.R.S.A. § 2071(2)(A) (emphasis added).

As both sides acknowledge, *see* Defendant's Suppl. Memo at 4-5; Government's Suppl. Memo at 2, the Law Court had occasion in *State v. Seavey*, 564 A.2d 388 (Me. 1989) (Hornby, J.), to construe substantially similar language as then codified at 29 M.R.S.A. § 1191. In *Seavey*, a police officer had stopped a driver who failed to signal a right turn while the officer, traveling in the opposite direction, was waiting to make a left turn at the same intersection. *See Seavey*, 564 A.2d at 388. The Law Court rejected the defendant's argument that he had no obligation to use his turn signal because, as the officer had admitted, the defendant had the right of way at the intersection, as a result of which the officer was not traffic that "may be affected" by the defendant's turn. *See id.* at 389.

The Law Court explained:

> The statute dealing with turn signals, 29 M.R.S.A. § 1191, requires the use of a turn signal for every turn "in the event any other traffic may be affected by such

---

[4] It is not clear that 29-A M.R.S.A. § 2071, the only traffic statute cited by the government, obliges a driver to signal when changing lanes. That statute provides that "[a]n operator may not turn a vehicle or move right or left on a public way unless the movement can be made with reasonable safety." 29-A M.R.S.A. § 2071(1). Yet, it discusses signaling only in connection with turns, stops, and decreases in speed, not movements to the right or left (*i.e.*, lane changes). *See id.* § 2071(2)-(5). However, the defendant has not challenged the proposition that changing lanes without signaling is a traffic infraction. *See, e.g.*, Defendant's Suppl. Memo at 3-4. In any event, even if the defendant was not required to signal before changing lanes, the stop of the Saturn is supportable on the other two bases offered by the government.

13

> movement." Clearly, it was the intent of the Legislature to mandate the use of a turn signal any time any other vehicles might be affected by the turn. If there is no other traffic whatsoever, a turn signal is not required. Although it is true that most, if not all, Maine cases which have discussed the use of turn signals, usually in the context of a damages action, have dealt with the use of a turn signal when making a left turn, the statute clearly [e]nvisions the use of a signal for a right turn. See 29 M.R.S.A. § 1193.[5]
>
> Anytime there is a vehicle waiting at an intersection a driver approaching that intersection from the opposite direction has a duty to use a turn signal if the driver intends to turn for the reason that the waiting vehicle may be affected by the turn. For example, the waiting driver upon seeing the turn signal will know that the oncoming vehicle will be slowing down in order to turn and will be able to time his own turn or other action accordingly.
>
> The issue is not whether this police officer's actions as a driver were in fact affected, but whether the defendant should have concluded that the police car was "other traffic [that] *may* be affected" (emphasis supplied). Clearly it was, as the District Court concluded.

*Id*.

The government interprets section 2071(2)(A) and *Seavey* as standing for the proposition that unless there is no other traffic, a driver must signal before making a turn. *See* Government's Suppl. Memo at 2-3. As the government points out, *see id*. at 3, the United States District Court for the District of Rhode Island, construing the same language in a Rhode Island statute, also rejected a defendant's argument that he was not required to use his turn signal, despite the presence of other traffic, because the turn would not affect that traffic, *see United States v. Correa*, 881 F. Supp.2d 272, 278 (D.R.I. 2012). The *Correa* court noted that, while the defendant's argument got "kudos for creativity," it failed under scrutiny because, "[s]o long as there were other cars in the area, which there were in this case, Correa was required to use his turn signal pursuant to § 31-16-5, because 'other traffic may be affected by the movement.'" *Id*. (citations omitted).

---

[5] Section 1193, which prescribed methods of giving hand and arm signals when making a left or right turn, stopping, or decreasing speed, was repealed effective January 1, 1995. *See* 29 M.R.S.A. § 1193 (1994). Its substance is now codified at 29-A M.R.S.A. § 2071(5).

14

The defendant interprets section 2071(2)(A) and *Seavey* as standing for the proposition that the duty to signal depends on whether the failure to signal would create an ambiguity. *See* Defendant's Suppl. Memo at 5. In his supplemental memorandum and at oral argument, he contended that *Seavey* is distinguishable in that, there, the cars were facing each other at an intersection, a situation in which the other driver's intention is helpful to know, whereas he was in a dedicated left-hand turning lane and could only have turned left. *See, e.g., id*. at 5 (asserting that his left-hand turn "was mandated by the *design* of the highway" and that "no driver could have conceivably understood him to be doing otherwise than making a left-hand turn") (emphasis in original). He adds that a survey of caselaw from other states involving similar statutory language suggests that the use of a turn signal is necessary only when there otherwise would exist some ambiguity respecting the driver's intention in making a turn that would affect other traffic. *See id*. at 5-6.

The government has the better argument. The driver in *Seavey* contended that his turn could not have affected the officer because he, the defendant, had the right of way. *See Seavey*, 564 A.2d at 389. In similar vein, the defendant contends that his turn could not have affected other traffic because, by virtue of the road's design, he could only have turned left. Yet, *Seavey* recognizes that, unless there is no other traffic, a turn can affect other traffic. For example, as the government pointed out in its supplemental memorandum and at oral argument, *see, e.g.*, Government's Suppl. Memo at 4, it would be physically possible for a driver on Fore River Parkway approaching the intersection with Congress Street to move into the right-hand turning lane from one of the two left-hand turning lanes before encountering the island that separates those lanes. The use of the left-hand signal thus imparts useful information to drivers behind and alongside that driver.

The eight cases from other jurisdictions that the defendant cites, *see* Defendant's Suppl. Memo at 6, do not persuade me otherwise. None involves a situation in which a driver failed to signal while in a dedicated turning lane. Six simply hold that a party's failure to activate a turn signal violated, or could have been found to have violated, statutes similar to section 2071(A)(2). *See State v. Lombardi*, 727 A.2d 670, 672-73 (R.I. 1999) (defendant made the "plausible argument" that statute did not require that he signal because there was no other traffic; however, his underlying premise was flawed in that he had pleaded guilty to a charge of failing to give a proper turn signal and, in any event, pointed to no evidence that there was no other traffic); *Armstrong v. Polaski*, 369 A.2d 249, 250-51 (R.I. 1977) (in automobile accident case in which defendant's alleged failure to signal could have been found to have caused collision, trial judge erred in failing to instruct jury that defendant was obliged by statute to give an appropriate signal of his intention to turn); *Marcio v. Helm's Express Inc.*, 228 A.2d 128, 130-31 (Conn. 1967) (rejecting plaintiff's argument that he was not required to give a signal if, as he commenced left turn, the truck that struck him was not within his vision; stating, "[N]o exception to the signal requirement exists merely because there is no risk of collision in making the turn."); *Brown v. Gottesman*, 165 A.2d 43, 45-46 (N.H. 1960) (defendant could be found to have violated statute, contributing to automobile accident, when he cut across road without signaling, intending to park on opposite side); *Cyr v. Sanborn*, 140 A.2d 92, 95 (N.H. 1958) (defendant in automobile accident case plainly violated statute when, although he was aware other cars were traveling behind his, he failed to signal before turning left); *Sullivan v. Le Blanc*, 125 A.2d 652, 655 (N.H. 1956) (rejecting defendant's argument, in automobile accident case, that vehicle engaged in passing her could not have been "affected by" her failure to signal that she was turning right when operator of passing vehicle testified that he would not have tried to pass if he knew she was turning).

A seventh case, *People v. Carmona*, 124 Cal. Rptr.3d 819 (Ct. App. 2011), appears at first blush to support the defendant's argument: the court held that the defendant's unsignaled right-hand turn at an intersection could not have affected traffic. *See Carmona*, 124 Cal. Rptr.3d at 821, 823. However, in *Carmona*, the sole vehicle in the vicinity, a police car that was approaching the intersection from the opposite direction, was still 55 feet away from the defendant's car when the defendant turned. *See id*. at 821. This distinguishes *Carmona* not only from *Seavey*, in which the police officer was stopped at the intersection waiting to turn, but also from this case, in which the defendant fairly can be said to have been in the thick of traffic.

The final case, *People v. Martinez-Lopez*, 834 N.Y.S.2d 852 (Dist. Ct. 2007), is inapposite. The court held that language in statutes different from that at issue here mandated that drivers signal when changing lanes. *See Martinez-Lopez*, 834 N.Y.S.2d at 854-57.[6]

In sum, *Seavey* suggests that, pursuant to section 2071(2)(A), a motorist must signal a turn unless there is no other traffic present. Even assuming, *arguendo*, that *Seavey* leaves the door open to a finding that there are circumstances when other traffic is present and might not be affected by the failure to signal a turn, that was not the case when the defendant made the turn at issue. As the government argued, traffic might have been affected had the defendant moved into the right-hand turning lane as he approached the intersection. Had he signaled left, he would have made his intention clear. In addition, a signal would have alerted drivers approaching from behind, whose view of both the intersection ahead and the left-hand turning signs on the roadway might have been obscured, that a turn was required.

---

[6] The *Martinez-Lopez* court noted that the New York Legislature had replaced a statute similar to that at issue here, which it characterized as leaving to motorists' discretion whether a turn would affect other traffic, with a statute setting forth a *per se* rule for signaling turns, *see Martinez-Lopez*, 834 N.Y.S.2d at 856-57. However, the Law Court in *Seavey* clearly did not construe Maine's similar statute as leaving to motorists' discretion whether other traffic is affected.

17

Pelletier, therefore, lawfully stopped the defendant on suspicion of failing to signal a turn in violation of section 2071(2)(A).

### B. Arrest; Search of Defendant's Person

Pelletier learned upon identifying the defendant that he was subject to arrest on two outstanding warrants. He, therefore, lawfully placed him under arrest.[7] "If an arrest is lawful, the arresting officers are entitled to search the individual apprehended pursuant to that arrest." *United States v. Vongkaysone*, 434 F.3d 68, 75 (1st Cir. 2006) (citation and internal quotation marks omitted). The search of the defendant's person that yielded the suspected cocaine and concealed padlock, therefore, was a lawful search incident to arrest.

### C. Vehicle Search

As the government contended both in its supplemental memorandum and at oral argument, *see, e.g.*, Government's Suppl. Memo at 4-5, the defendant falls short of demonstrating that he had a reasonable expectation of privacy in the Saturn, which was not registered to him.

The First Circuit has observed:

> Before a court may reach the merits of a motion to suppress, the defendant carries the burden of establishing that he had a reasonable expectation of privacy with respect to the area searched or . . . the items seized. Although the threshold requirement is referred to as standing, it is more properly considered under a Fourth Amendment analysis. Failure to present evidence with respect to such an expectation prevents a defendant from making a claim for suppression under the Fourth Amendment.

*Rodríguez-Lozada*, 558 F.3d at 37 (citations and internal punctuation omitted). "The Supreme Court has set out a two-part test for analyzing the expectation question: first, whether the movant

---

[7] In his supplemental memorandum, the defendant asserts in passing that the arrest warrants were then invalid. *See* Defendant's Suppl. Memo at 4 n.2. "Arrest warrants in the hands of a police officer, unless facially invalid, are presumed valid[.]" *Thurmond v. County of Wayne*, 447 Fed. Appx. 643, 648 (6th Cir. 2011) (citation and internal quotation marks omitted). The defendant makes no reasoned argument that the warrants were facially invalid and does not otherwise demonstrate that they were.

has exhibited an actual, subjective, expectation of privacy; and second, whether such subjective expectation is one that society is prepared to recognize as objectively reasonable." *United States v. Rheault*, 561 F.3d 55, 59 (1st Cir. 2009) (citation omitted).

"First Circuit precedent reflects that, in general, 'standing' does not exist to challenge a search of a vehicle when the defendant neither owns nor is in possession of the vehicle in question." *United States v. Paquette*, No. CRIM 04-10BW, 2005 WL 850847, at *2 (D. Me. Apr. 12, 2005) (rec. dec., *aff'd* May 2, 2005) (footnote and citation omitted). The mere fact that a defendant was driving a vehicle during a traffic stop is insufficient to confer "standing" to challenge its search. *See, e.g., id*. at *2-*3 (defendant lacked standing to challenge search of vehicle's trunk when he was neither the owner nor the individual in exclusive possession of the vehicle; conceivably, he might have been able to establish both "historical use" of the vehicle and that he was able to "regulate access" to it given that vehicle had served as his conveyance for a period of weeks, but on record before court, he lacked "standing" to challenge the constitutionality of search of vehicle) (internal quotation marks omitted).

The defendant, therefore, cannot challenge the search of the Saturn. In any event, even had he demonstrated that he possessed a reasonable expectation of privacy in that vehicle, I would recommend denial of his motion to suppress the evidence seized from the Saturn on the basis that Pelletier validly searched the vehicle incident to the defendant's arrest. As the government argues, *see* Objection at [6], officers may search a vehicle incident to arrest when, *inter alia*, "it is reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle (the evidence-preservation justification)[,]" *United States v. Polanco*, 634 F.3d 39, 42 (1st Cir. 2011) (citations and internal quotation marks omitted). The crimes of arrest included possession of cocaine and a concealed padlock, and Pelletier had observed the defendant leaning to the right

19

after he pulled the Saturn over on Douglass Street.  Thus, it was reasonable to believe that further contraband might be found in the vehicle.

### III.  Conclusion

For the foregoing reasons, I recommend that the defendant's motion to suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 12th day of May, 2014.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge